Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Z.G., and C.G.,<br><br>          Plaintiffs,<br><br>vs.<br><br>CIGNA HEALTHCARE INSURANCE COMPANY,<br><br>          Defendant. | COMPLAINT<br><br><br>Case No. 2:25-cv-00884 |

Plaintiffs Z.G. and C.G., through their undersigned counsel, complain and allege against

Defendant Cigna Healthcare Insurance Company ("Cigna") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Z.G. and C.G. are natural persons residing in Washington County, Oregon Z.G. is C.G.'s

    father.

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the

    insurer and claims administrator, as well as the fiduciary under ERISA for the insurance

plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Z.G. was a participant in the Plan and C.G. was a beneficiary of the Plan at all relevant times. Z.G. and C.G. continue to be participants and beneficiaries of the Plan.

4. Plan participants and beneficiaries were told that Cigna was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, Cigna acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. C.G. received medical care and treatment at Blue Fire Wilderness ("Blue Fire") from December 27, 2021, to April 7, 2022, and Roots Transition ("Roots") from April 8, 2022, to January 20, 2023. These are licensed treatment facilities located in Gooding County, Idaho and Summit County Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. Cigna, at times doing business as Evernorth Behavioral Health, denied claims for payment of C.G.'s medical expenses in connection with her treatment at Blue Fire and Roots.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna does business in Utah, and the treatment at issue took place in Utah.

10. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and C.G.'s privacy will be preserved.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## **BACKGROUND FACTS**

### **C.G.'s Developmental History and Medical Background**

12. C.G. started to withdraw emotionally around middle school and by the end of 2020 she was even more withdrawn and exhibiting signs of anxiety and anger.

13. C.G. began high school in the middle of the COVID-19 pandemic. Causing her to become even more withdrawn and isolated, schools were shut down and she started her freshman year in her bedroom alone, online.

14. It was at this time that her parents noticed a severe downturn in C.G.'s demeanor.

15. Many mornings they could not get her out of her bed to bathe or eat.

16. C.G. has been a straight A student her whole life but suffered from both lack of motivation and great anxiety about not completing her work.

17. By freshman year, C.G. was no longer able to organize her studies or manage her time and was not completing assignments on time or living up to the standard that she held for herself.

18. As the year continued, C.G. became more withdrawn, uncommunicative, lethargic, and depressed.

19. C.G. spent most of her time in her bed with the lights off.

20. She refused to discuss her issues with her parents and was vehemently against getting treatment.

21. In March 2021, C.G.'s parents found her a psychiatrist and therapist.

22. The psychiatrist diagnosed C.G. with severe persistent depression and generalized anxiety disorder and prescribed her medications.

23. C.G. was uncommunicative with the therapist.

24. In April 2021. C.G. attempted suicide by overdose. Her parents immediately took her to the emergency room, and she was admitted to the hospital.

25. Her parents also sought additional treatment, but it was largely ineffective.

26. C.G.'s parents learned that she had been self-harming by cutting and burning herself, as well as giving herself bruises, since the end of eighth grade.

27. From July to October 2021, C.G. saw a new therapist for outpatient therapy.

28. C.G. was more communicative with this therapist but was still not making progress.

29. C.G.'s depression continued into her sophomore year, and she would often call home from school crying and asking to leave due to severe anxiety and panic attacks.

30. C.G. was skipping school because she was overwhelmed by the noise, students, and work.

31. C.G.'s parents also learned that she was meeting with a drug dealer and buying any kind of drug to numb out and not feel the anxiety, panic, and depression that was crushing her.

32. Throughout 2020-2021, C.G. continued to cut and self-harm on her arms, legs, and abdomen.

33. C.G.'s mother had to change C.G.'s sheets daily because they were always covered with blood from her cuts.

34. C.G.'s parents tried to reduce her risk of self-harm by taking precautions and removing all sharp items, but C.G. found innovative ways to harm herself despite their best efforts.

35. C.G. attempted a second suicide by overdose in October 2021.

36. C.G.'s therapist indicated that C.G.'s behavioral problems were too severe for them to effectively handle and suggested that another therapist should be found because she did not feel she was able to help C.G.

37. Thus, C.G.'s parents found another psychiatrist, but C.G. was still resistant.

38. In November of 2021, C.G. went weeks without getting out of bed. She was struggling to sleep and was awake most of the night due to nightmares.

39. One night in late November, C.G. was so despondent, sobbing to her parents and told them she could not go on any longer and that she wanted to give up. She said that her family would be able to get over her loss and move on with their lives, that she was

worthless and ruining the family. She repeated that she was done with it all and wanted to give up.

40. C.G.'s parents called her psychiatrist who advised them to sleep next to her, not leave her sight, and bring her into the office first thing in the morning. She also indicated that C.G. was not safe and was at high risk for suicide.

41. The next morning C.G. and her parents met with the psychiatrist and after her evaluation, said C.G was at extreme risk for suicide and needed to go to the emergency room immediately and be admitted to the adolescent psychiatric unit at Willamette Falls, known as CAPU: Child and Adolescent Psychiatric Unit.

42. C.G. was admitted to the emergency department psychiatric unit on December 1, 2021, but CAPU had a waiting list, so she had to stay in the adult emergency room.

43. A space opened in CAPU and C.G. began her residence there the evening of December 2, 2021.

44. C.G. was evaluated by a psychiatrist who increased her medication dosage of Prozac and prescribed her tranquilizers.

45. C.G. still wasn't sleeping due to nightmares.

46. C.G. did participate in group therapy and art therapy but did not make any progress in terms of suicidal ideation, self-harm urges, sleeping, or mitigation of depression or anxiety symptoms.

47. C.G. continued to be withdrawn and uncooperative in one-on-one therapy.

48. After multiple assessments and sessions, she shared with the psychiatrist that she was sexually assaulted in seventh grade; thus, PTSD and trauma were added to her diagnoses.

49. After several weeks in the psychiatric unit, the doctors assessed that C.G. needed more direct care and recommended she take a continued leave from school and that she attend an adolescent partial hospitalization program in St. Vincent's Hospital called Providence Pathways ("Pathways").

50. The day after C.G. was released from the hospital, her parents took her to the Pathways treatment center.

51. C.G. was assessed at Pathways and the therapist told her parents she was not safe, was at high risk of suicide, and needed to go directly back to the emergency room to be readmitted to the psychiatric unit.

52. On December 18, 2021, C.G.'s parents took her back to the emergency room and waited another 24 hours to be admitted into the psychiatric unit.

53. C.G.'s parents hired two consultants to source the best treatment programs.

54. The consultants did extensive research on C.G., including examining her records, speaking with her therapists, pediatrician, and school counselor, reviewing transcripts and teachers' reports, family history, family interviews, and writing samples.

55. Given the nature of C.G.'s personality, her age, her diagnoses, and the failure of all other levels of treatment, the consultants strongly recommend she be admitted to an outdoor wilderness therapy program.

**Blue Fire**

56. C.G. was admitted to Blue Fire on December 27, 2021.

57. Plaintiffs received a series of Explanation of Benefits ("EOBs") statements denying coverage under the following rationale: "XS1 This service is not a covered expense as defined by your plan."

58. On September 7, 2022, Plaintiffs appealed the denial of coverage.

59. Z.G. wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

60. Z.G. expressed concern that the denial of payment for C.G.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification. Z.G. identified skilled nursing facilities, rehabilitation facilities, and subacute facilities as some of the medical or surgical analogues to the treatment C.G. received.

61. Z.G. also requested that Cigna complete a comparative parity analysis.

62. Z.G. quoted the definition of an "Other Health Care Facility" in the Plan and argued that Blue Fire met this definition and thus her treatment should have been approved as a covered benefit under the Plan.

63. In addition Z.G. asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician

or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

64. In a letter dated October 28, 2022, Cigna denied coverage for C.G.'s treatment at Blue Fire under the rationale that the "requested service is Outdoor/Wilderness Behavioral Health services. Your benefits do not include coverage for Outdoor/Wilderness Behavioral Health services."

65. On April 19, 2023, Plaintiffs appealed the denial of coverage for C.G.'s treatment at Blue Fire.

66. Plaintiffs argued that by adding new denial rationales and not responding to the issues raised in their previous appeal, Cigna violated ERISA. Plaintiffs argued that they were entitled to an additional level of appeal as Cigna appeared to have engaged in a "trial run" denying payment for one reason and then changing that reason in future denials. Depriving them of their opportunity to respond in violation of ERISA.

67. Plaintiffs also raised concern that the reviewer was not appropriately qualified to review the case.

68. Plaintiffs further asserted that Cigna failed to provide the clinical explanation to support their experimental denial of these services, as is required under the Plan.

69. Plaintiffs argued that Outdoor Behavioral Health Programs are not experimental, and coverage is available under the Plan.

70. Z.G. also argued that C.G.'s treatment was medically necessary and provided behavioral and treatment history to support this assertion.

71. Z.G. also included three letters of medical necessity from C.G.'s treating providers confirming the medical necessity of the treatment at issue.

72. Plaintiffs also noted that the documents necessary to complete a parity analysis were not provided.

73. Z.G. again requested that Cigna conduct a parity analysis and provide him with physical copies of the findings.

74. In a letter dated October 9, 2023, Cigna informed Plaintiffs that appeals have been exhausted. Cigna did not address Z.G.'s contention that it had forced him to submit a second appeal by introducing new arguments without giving him the opportunity to respond.

**Roots**

75. C.G. was admitted to Roots on April 8, 2022.

76. In a letter dated October 26, 2023, Cigna denied coverage for C.G.'s treatment at Roots under the following rationale:

> Based upon my review of the available clinical information and the MCG Behavioral Health Guidelines, medical necessity was not met for admission and continued stay at Residential Behavioral Health Level of Care, Child or Adolescent, ORG: B-902-RES from 04/07/2022 forward, as you did not have a moderately severe mental health disorder or other co-existing condition with significant impairments in functioning requiring this intensity level of treatment and 24 hour monitoring. This information provided does not indicate that you were so impaired that you could not carry out your essential daily functions. As there was nothing proposed requiring around-the-clock structure and clinical interventions, there was nothing suggesting that you would not have been able to successfully and safely use a less intensive and/or less restrictive setting to continue working on your trauma issues and mastery of healthy coping skills and for medication management rather than an extended stay in an around-the-clock setting. A less restrictive level of care was available for your safe and effective treatment.

77. On April 15, 2024, Plaintiffs appealed the denial of coverage.

78. Z.G. again wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately

qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

79. Z.G. raised concerns regarding MHPAEA violations due to non-quantitative treatment limitations ("NQTL") imposed by Cigna.

80. Plaintiffs raised concern that the MCG Criteria can lead to improperly requiring patients to exhibit *acute* psychiatric symptoms, such as danger to self or others, or otherwise be at risk of acute dangerousness, in order to obtain coverage for subacute behavioral health treatment.

81. Plaintiffs argued that they found these same acute symptoms reflected in Cigna's denial rationale.

82. Plaintiffs cited multiple court cases to support their arguments.

83. Plaintiffs argued that Cigna misapplied the MCG criteria in a manner that overemphasized acute symptoms, while choosing to ignore the other factor that can qualify a patient for admission to residential treatment.

84. Plaintiffs further argued that depression, anxiety, sexual trauma, PTSD, substance abuse, and C.G.'s other conditions could not be solved with short-term stabilization attempts.

85. Z.G. went through the MCG guidelines point by point and argued that when applied properly, they indicated that C.G. met the guidelines for admission to residential treatment level of care.

86. Plaintiffs also included letters of medical necessity with their appeal.

87. For instance, in a letter dated February 27, 2023, Rebekah Phipps, CMHC, a therapist a

Roots stated in part:

> [C.G.] was admitted to my caseload at ROOTs Transition on 04/08/2022, following completion of their wilderness therapy program at Blue Fire Wilderness Therapy. During their time at Blue Fire, it was assessed and determined by multiple mental health care professionals that [C.G.] required ongoing treatment to sustain therapeutic progress being made. This recommendation specified the level of care of residential programming to adequately support their socioemotional, academic, and behavioral needs.

88. Additionally, in a letter dated March 5, 2023, Pamela Sheffield, Psy.D., an independent

educational consultant, stated in part:

> Our assessment was completed in March 2021 and was intended to identify [C.G.]'s social, emotional, psychological and academic needs and to recommend appropriate therapeutic and academic interventions to address the specific issues we identified.
>
> We first began our work with [C.G.]'s family when she was hospitalized for a second time related to suicidal ideation. she [sic] was re-admitted to the hospital when it was determined that her therapeutic needs exceeded the partial hospitalization level of care. It was determined that she would benefit from a higher level of care following her discharge from the CAPU.
>
> In order to determine an appropriate course of action, we began by obtaining a thorough social and developmental history from [C.G.]'s parents. We also conducted interviews with her attending psychiatrist at the CAPU program as well as with her previous treating outpatient psychologist. Our assessment revealed that [C.G.] was experiencing not only acute level of depression and suicidal ideation, but also challenges with connecting with a therapist and being open and vulnerable about the circumstances related to her psychological distress. It was also noted that [C.G.]'s family and the professionals who had worked with her that she was using cannabis and alcohol to cope with her emotions. Her parents had tried a variety of outpatient interventions, psychiatric interventions, utilizing every resource that was recommended, none of which seemed to provide a meaningful effect.
>
> Given [C.G.]'s long-standing difficulties and failure of different therapeutic interventions in an outpatient and partial hospital setting, it was our opinion that she would be most impacted by enrolling in a clinically sophisticated high-level program that could provide meaningful therapeutic interventions, a safe and secure environment where she would not have access to substances, as well as a comprehensive psychological assessment. It was paramount in this placement

that, in addition to being able to support her therapeutic needs, that she was placed in an environment with professionals highly skilled in working with students with similar issues and in milieu of her peers who were of similar age and profile. Hence, the recommendation to Blue Fire Wilderness Program in Gooding, Idaho.

During [C.G.]'s time at Blue Fire, she worked with Lindsay Myrick, LCPC-S. She demonstrated significant improvements in terms of her willingness to be open about her struggles and provide important clinical details and context to her history that enabled the therapist to provide more targeted support. The recommendations from the testing psychologist, Dr. Jeremy Chiles, as well as Lindsay Myrick, team, was that [C.G.] continue her work at a therapeutic program that would be able to continue her work on increasing cognitive flexibility, addressing underlying mental health issues, in an environment that also incorporated elements of outdoor behavioral health which was an intervention and environment that [C.G.] found personally impactful. Thus the recommendations for ROOTs Transition.

89. In a letter dated May 21, 2024, Cigna denied coverage for C.G.'s treatment at Roots under the following rationale:

> Based upon my review of the available clinical information and the MCG Behavioral Health Guidelines, medical necessity was not met for continued stay at Residential Behavioral Health Level of Care, Child or Adolescents, ORG: B-902-RES from 08/01/2022-01/21/2023. Medical necessity has not been established because: You did not have a moderately severe mental health disorder or other co-existing condition with significant impairments in functioning requiring this intensity level of treatment. You had not recently demonstrated impairments in functioning of such severity as a result of a mental health disorder that require the intensity level of treatment intervention and 24-hour monitoring of the Residential Behavioral Health Level of Care, Child or Adolescents. The information provided does not indicate that you continued to be so impaired that you cannot carry out your essential daily functions. You had not developed new symptoms and/or behaviors that required this intensity level of treatment. You and/or those who provide support for you understood the plan for follow-up treatment and services that were available in a crisis. You have sufficient support to participate as needed in appropriate monitoring and follow-up at an available less restrictive level of care. A less restrictive level of care was available for your safe and effective treatment.

90. In a letter dated July 3, 2024, Plaintiffs appealed the denial of coverage.

91. Plaintiffs raised concerns regarding inaccuracies in the denial letter such as C.G.'s discharge date.

92. Z.G. wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

93. Z.G. again asserted that Cigna had violated MHPAEA.

94. Plaintiffs argued that Cigna imposed non-quantitative treatment limitation on the treatment at issue as Cigna denied continued stay at a sub-acute intermediate behavioral healthcare facility due to lack of acute symptomology.

95. Z.G. included two letters of medical necessity with the appeal as well as copies of C.G.'s medical records to demonstrate how C.G.'s treatment at Roots was medically necessary.

96. Plaintiffs argued that Cigna misinterpreted the MCG criteria in a manner that overemphasized acute symptoms, while choosing to ignore other, non-acute, factors that can qualify a patient for admission to residential treatment.

97. Plaintiffs further argued that C.G.'s depression, anxiety, sexual trauma, PTSD, substance abuse, and other conditions could not so easily be solved with short-term stabilization attempts.

98. Z.G. again outlined the MCG guidelines and once more went through point by point, listing seven detailed reasons supporting that C.G. met the guidelines for admission to residential treatment level of care.

99. Plaintiffs cited multiple court cases where an insurer's compliance with generally accepted standards of care was brought into question to support the concerns Plaintiffs expressed about the appeal process and the MCG Criteria.

100. Plaintiffs also submitted a letter dated September 25, 2024, regarding the general mishandling of the case, specifically the appeal process.

101. Plaintiffs received no response to this appeal.

102. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

103. The denial of benefits for C.G.'s treatment was a breach of contract and caused Z.G. to incur medical expenses that should have been paid by the Plan in an amount totaling over $190,000.00.

104. Cigna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Z.G.'s request.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

105. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

106. Cigna and the Plan failed to provide coverage for C.G.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

107. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

108. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Z.G.'s appeals or whether it provided him with the "full and fair review" to which he is entitled. Cigna failed to substantively respond to the issues presented in Z.G.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

109. In fact, Cigna's denial letters rely on formulaic recitations do not address the arguments raised by Z.G. in any capacity and are largely identical in terms of content despite ostensibly being conducted by different reviewers, and despite the different information and appeals Z.G. submitted between denial letters.

110. Further, Cigna failed or refused to respond to some of Z.G.'s appeals even though they were issued as a direct consequence of it changing its denial rationales without giving him an opportunity to respond.

111. Cigna and the agents of the Plan breached their fiduciary duties to C.G. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.G.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.G.'s claims.

112. The actions of Cigna and the Plan in failing to provide coverage for C.G.'s medically necessary treatment violate the terms of the Plan and its medical necessity criteria.

113. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

114. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

115. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

116. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

117. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

benefits for mental health or substance use disorder treatment. 29 C.F.R.

§2590.712(c)(4)(ii)(A), (F), and (H).

118. The application of the medical necessity criteria used by Cigna for the intermediate

level mental health treatment benefits at issue in this case are more stringent or restrictive

than the application of the medical necessity criteria the Plan applies to analogous

intermediate levels of medical or surgical benefits.

119. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the

benefits the Plan excluded for C.G.'s treatment include sub-acute inpatient treatment

settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation

facilities.

120. When Cigna and the Plan receive claims for intermediate level treatment of medical and

surgical conditions, they provide benefits and pay the claims as outlined in the terms of

the Plan based on generally accepted standards of medical practice.

121. Cigna and the Plan evaluated C.G.'s mental health claims employing medical necessity

criteria in a manner that deviates from generally accepted standards of medical practice.

This process resulted in a disparity because the Plan denied coverage for mental health

benefits when the analogous levels of medical or surgical benefits would have been paid.

122. MHPAEA violations can be both quantitative (e.g., a coverage limit of one month for

mental health services and six months for medical surgical services) or nonquantitative

(such as requiring supervision by a doctor at a mental health facility and a doctor's aide at

a medical/surgical facility.)

123. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that C.G. received.

124. Cigna's improper use of acute inpatient medical necessity criteria is revealed by its use of the MCG criteria which uses acute criteria to evaluate subacute residential treatment.

125. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that C.G. received.

126. In addition, Cigna denied payment for C.G.'s treatment in part because C.G. was not "so impaired that you could not carry out your essential daily functions." This is another example of Cigna requiring acute care criteria to evaluating the medical necessity of C.G.'s treatment in a way that was inconsistent with the sub-acute treatment she was receiving. Had C.G. been impaired to the point that she could not carry out her essential daily functions, she would have required acute hospitalization, not sub-acute inpatient care.

127. Cigna's evaluation of medical necessity and coverage for C.G.'s care using acute care criteria violated MHPAEA because when it evaluates the medical necessity and coverage for individuals being treated at comparable sub-acute levels of inpatient care for medical and surgical conditions, Cigna does not apply acute care criteria.

128. Furthermore, the level of care applied by Cigna failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

129. Generally accepted standards of medical practice for medical and surgical

rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

130. Z.G. noted that Cigna restricted the availability of C.G.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. Z.G. argued that not only did Cigna exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all.

131. The actions of Cigna and the Plan requiring conditions for coverage that do not align with generally accepted standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

132. Cigna denied C.G.'s outdoor behavioral health treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

133. Plaintiff is aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Cigna.

134. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of

medical practice for residential treatment centers include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

135. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

136. Cigna and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Cigna and the Plan were not in compliance with MHPAEA.

137. In fact, despite Z.G.'s request that Cigna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Cigna and the Plan have not provided Z.G. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Cigna and the Plan have not provided Z.G. with any information about the results of this analysis.

138. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for his loss arising out of the Defendant's violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

139. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

140. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of fail-first criteria for medical necessity are not available as remedies for a wrongful denial of plan benefits.

141. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a sub-acute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

142. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C. §(a)(1)(B).

143. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1.     Judgment in the total amount that is owed for C.G.'s medically necessary treatment at Blue Fire and Roots under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.     For such further relief as the Court deems just and proper.

DATED this 3rd day of October, 2025.

By _____ s/ Brian S. King _____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Washington County, Oregon.